AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  **21-MJ-1613** |
| A NightOwl 3.0 DVR with model # DVR-X3-81-JF, and SN #977C-001392 (Target Device 10) | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-10.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-10.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 856 | Maintaining a drug involved premises; Illegal gambling; and Conspiracy to |
| 18 USC sec. 1955, 371 | Maintain a Drug Involved Premises and to Operate an Illegal Gambling Business. |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent Kari S. Harrison.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Kari S. Harrison*
*Applicant's signature*

Kari S. Harrison, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date:  _____04/28/2021_____

*Barbara L Major*
*Judge's signature*

City and state:  San Diego, California

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR**

**WARRANTS TO SEARCH ELECTRONIC DEVICES**

I, Kari S. Harrison, being duly sworn under oath, declare and state:

EXPERIENCE AND TRAINING

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §§ 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed since June of 2006.  I am assigned to the San Diego Field Division on the Violent Crime Task Force-Gang Group (VCTF-GG).  I have received basic federal law enforcement training, including the training at the FBI Academy, as well as other specialized federal law enforcement training. I have received formal training and have experience in narcotics investigations and gang investigations, including street gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons under investigation, including wiretap communications of drug traffickers and gang members and associates. I have worked alongside and consulted with many law enforcement officials and other professionals experienced in drug and gang investigations.

3.      Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members discuss and text criminal matters over the telephone and often use coded or vague language. I am aware of how drug traffickers and gang members use their phones to organize and operate their illegal activities. I am familiar with the typical make up and

operation of gangs and drug trafficking organizations including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

4.     I have also investigated illegal gambling dens in San Diego. I have become familiar with how illegal gambling dens are operated and utilize the sales and usage of controlled substances, primarily methamphetamine, in order to draw and maintain a customer base. I have also become familiar with the hierarchy of employees, how employees communicate through social media and phones, security measures such as surveillance, the presence of weapons including firearms, and crimes being committed inside these dens such as narcotic sales, robbery, extortion, identity theft, and fencing stolen property. I have participated in over five search warrants served at illegal gambling dens and interviewed patrons and suspects from these locations.  Further, I have participated in multiple investigations involving premises maintained for the purpose of distributing drugs.  As part of these investigations, I have used various investigative techniques including telephone toll analysis, social media analysis and electronic examinations of evidence.

5.     The following is based my own investigation, oral and written reports by other law enforcement officers, physical surveillance, interviews, database and public records checks, searches, telephone toll analysis, and other investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Conversations and discussions below are set forth in substance unless noted.

6.     I submit that the facts contained herein demonstrate probable cause to believe that evidence of a crime; contraband, fruits of a crime, or other items illegally possessed; or property designed for use, intended for use, or used in committing a crime, specifically, violations of Title 21, United States Code, Section 856, (Maintaining a Drug Involved Premises); Title 18, United States Code, Section 1955, (Illegal Gambling); and Title 18, United States Code, Section 371 (Conspiracy to Maintain a Drug Involved Premises and

Illegal Gambling Business); as described in Attachments B-1 through B-16, will be found in the following electronic devices:

a.   A White iPhone cellular telephone with unknown model number, IMEI # 35647610699700, passcode 0022 [provided by owner], seized from Thi Thanh Hoa Nguyen's person at 4776 El Cajon Blvd #102, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B84 (**Target Device 1);**

b.   A black Cobra 8CH HD Digital Video Recorder with ID# UH67UX2R2GKSTVEC111A seized from gambling den at 3772 Euclid Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B110 (**Target Device 2);**

c.   A black WiseNet Network Video Recorder with Model # SNR-73207W, FCC ID# NLMSNR73207W seized from gambling den at 3845 45th Street #2, San Diego, CA 92105, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B141 (**Target Device 3);**

d.   A black iPhone cellular telephone with unknown model number and unknown IMEI with a damaged camera lens on the back side of the telephone, seized from the bedroom of Tam Lai and claimed by Tam Lai at 2710 Highland Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B159 (**Target Device 4);**

e.   A Rose Gold iPhone cellular telephone with unknown model number and unknown IMEI with a crack on the lower left side of the back of the phone, seized from a purse in the bedroom of Tam Lai and claimed by Manisaeng Soukhaseum [girlfriend of Tam Lai] at 2710 Highland Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B160 (**Target Device 5);**

f.   A Black Motorola 48 MP cellular telephone with Model # XT2043-4, IMEI # 355539112340953, seized from a desk in the back corner of the gambling den at 5221 Geneva Ave., San Diego, CA, and currently in FBI custody under Case # 245D-SD-3034838, Evidence #1B172 (**Target Device 6);** and

3

g.   A dark blue Samsung cellular telephone with IMEI # 358620093321027, seized from the front bedroom of the gambling den at 5221 Geneva Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B183 **(Target Device 7)**;

h.   A white and silver iPhone cellular telephone with unknown model number and unknown IMEI, seized from Jasmine RIPP's person at gambling den at 5221 Geneva Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B187 **(Target Device 8)**;

i.   A black Samsung cellular telephone with IMEI # 355356112420325, seized from the gambling den at 4212 Copeland, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B197 **(Target Device 9)**;

j.   A NightOwl 3.0 DVR with model # DVR-X3-81-JF, and SN # 977C-001392 seized from gambling den at 4212 Copeland, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B211 **(Target Device 10)**;

k.   A NightOwl DVR with model # DVR-C50X-81-JF, and SN # 1208A-018989 seized from gambling den at 4727 Federal Boulevard, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B214 **(Target Device 11)**;

l.   A black and silver LG cellular telephone with model # LM-Q730MM, IMEI # 353889801691782, seized from the front desk of the gambling den at 4834 University Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B232 **(Target Device 12)**;

m.   A black Orbic cellular telephone with a cracked front screen with unknown model number and unknown IMEI seized from the front desk of the gambling den at 4834 University Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B233 **(Target Device 13)**;

4

n.   A black and silver LG cellular telephone with unknown model number and IMEI # 354525115093021, seized from the front desk of the gambling den at 4834 University Ave., San Diego, CA and currently in FBI custody under case # 245D-SD-3034838, Evidence # 1B234 **(Target Device 14);**

o.   A NightOwl DVR with model # DVR-C50X-81-JF and SN# 9101986099A-000187, seized from the gambling den at 4834 University Ave., San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B252 **(Target Device 15); and**

p.   A black and silver Samsung cellular telephone with model # SM-N975U and IMEI # 359761102976358, seized from the living room of the gambling den at 3690 43rd Street., San Diego, CA and claimed by Jimmy Lu, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B278 **(Target Device 16)**

(collectively, **Target Devices**) as described in Attachments A-1 through A-16, which are currently being held as evidence in the Southern District of California.

PROBABLE CAUSE

*Background on San Diego's Illegal Gambling Dens*

7.   In 2013, SDPD Street Gang Unit Detectives observed a steady increase in the prevalence of illegal gambling dens. Investigators learned that Asian gang members and associates were often involved in operating these illegal gambling dens and that methamphetamine was being used and sold at these illegal gambling dens. These locations were known as a "trap" or "trap houses." The illegal gambling establishments were often located inside houses, apartments, and outbuildings in residential neighborhoods predominantly in City Heights, in the East San Diego area.  It is common for gambling den owners to pay rent in cash to the owners of these properties and, in some cases, a percentage of the profits to cast a blind eye to all the foot traffic.

8.   In 2015, these locations began to draw more attention because of the frequency violent crimes occurring in and around them such as robberies, shootings, stabbings, and assaults. Investigators learned that the patrons were often gang members,

career criminals, habitual drug users, and fugitives.  Investigators believe that the criminal activity in and around these locations is due to these patrons.

9.    Investigators are aware of approximately twenty-four active illegal gambling dens operating in San Diego County. The illegal gambling dens are equipped with electronic gambling machines which are programmed with several games of chance such as poker, blackjack, keno, jacks or better, and slot games. Most locations of these establishments are open 24 hours a day, seven days a week, with some shutting down in the early morning hours and starting up again in the afternoons. Investigators are aware that most of these locations are outfitted with exterior and interior video surveillance cameras, which are often monitored remotely by the establishment owners and managers. Those locations equipped with surveillance equipment often contain monitors showing live feed of the video surveillance.

10.    Investigators learned that the owners will often not enter their own establishments but instead rely on trusted associates to open, operate and maintain the illegal gambling dens to reduce the likelihood that they will be identified by law enforcement.  Investigators are also aware that the owners often rely on seemingly unrelated individuals to rent and obtain utilities for these establishments to further avoid detection by law enforcement. The illegal gambling establishments typically have a hierarchy of employees. The employees often include: doorman, banker, and money courier.

11.    The doorman is generally an individual from the neighborhood who can recognize and screen patrons. Often, the doorman is a known gang member or a career criminal who has "respect" in the streets to deal with unwanted patrons, attempted robberies, and law enforcement. The doorman will also act as security or as an "enforcer" at the location by dealing with disputes, handling disturbances, monitoring the video surveillance, and reacting to law enforcement presence.

12.    The "banker" carries the "bank roll," meaning the money to provide change and winnings to customers. There are generally one or two bankers working inside at any

given time. The owners rely on trusted employees to conduct an "audit," which occurs at least twice in a twenty-four hour period. The audit is conducted by employees using a key to unlock and open gambling machines. The employees will retrieve the money from inside of the machines.  It is a common practice for employees to photograph the master audit screen of each machine and share it with owners/managers. The master audit screen shows the cash in, cash out (winnings), and net gain/profit. Employees will clear the screen after each audit. The employees will also document the cash in, cash out, net gain, loans to customers, and other information in paper ledgers.

13.   Owners may conduct several audits in a twenty-four hour period when the bank roll reaches a specified amount, such as $2,000. This is done to keep losses down from robbery and law enforcement seizures.  In many cases, the employees will have all patrons step outside to conduct an audit to avoid being robbed. In some cases, the employees will conduct an audit with patrons inside but attempt to keep them at a distance. The gambling machines at these locations conservatively take in more than $3,000 a day.

14.   Employees generally work a twelve-hour shift and make $50 - $250 per shift. At some locations, the owners will give a bonus based upon the amount of profit earned. Patrons tend to tip employees when they win jackpots, which are generally maxed at $1,000 - $1,200. The amount of time or tenure of employees varies. The current trend seems to be having one or two tenured employees and several short-term employees.

15.   Many owners utilize a money courier. The money courier brings additional bank roll to employees, collects money from the audit, and brings profits to the owners. The money courier also acts as a manager who directs employee's actions and makes decisions on behalf of the owners at these locations.

16.   Early investigative efforts revealed that one individual typically owned all of the gambling machines in a given illegal gambling den.  Investigators have noted, however, an increase in locations where the gambling machines are owned by multiple individuals. Each of these owners receive a percentage of profit.

17.     Investigators are aware that these illegal gambling dens are also drug involved premises.  The main draw to illegal gambling establishments is methamphetamine use and sales.  Investigators are aware, that other drugs are also known to be used and sold inside these establishments.  It is rare to have a patron who does not use or sell methamphetamine inside these locations. The people selling drugs inside may be employees or independent drug dealers. It is common for employees to hand out small amounts of methamphetamine and "comp" customers who are playing. One owner described how he would give methamphetamine to patrons because it would draw them to the location and kept them playing on gambling machines.

18.     In 2015, investigators executed numerous search warrants at illegal gambling dens in an effort to eliminate violent crimes associated with these establishments.  These establishments are often robbed.  The vast majority of these robberies were initially unreported to law enforcement. During search warrant executions at these locations, owners and patrons described drug use and sales inside these locations. However, due to enforcement operations, gambling den owners and employees have placed signs inside that say "no drug sales" or "no drugs."  More recent enforcement operations have revealed that drug sales and drug use has not abated.

19.     In the past two years, the number of violent crimes and property crimes in and around gambling den/drug premises has become more prevalent. From July 2018 through July 2020, there were over four hundred crime cases and over three hundred arrests within 150 feet of thirty-six illegal gambling locations investigated. The density of crime cases and arrests around these locations corresponds to the highest amount of crime in the East San Diego area. Law Enforcement has investigated homicides, shootings, stabbings, felony assaults, robberies, arson, auto thefts, burglaries, identity theft, firearm possession, drug sales/possession, and other crimes in and around these locations.

//

//

//

*Current Investigation*

20.     The FBI Violent Crimes Task Force Gang Group is currently investigating Long TRAN, aka "Long Tu;" Le Thi LE, aka "Chi Le;" and Dong NGUYEN. TRAN and NGUYEN are known to affiliate with the Vietnamese Boys/V-Boys Street Gang in San Diego. Based on information gathered thus far in the investigation, TRAN, LE and NGUYEN are involved in the operation of several illegal gambling dens where methamphetamine is being used and sold. The illegal gambling consists of electronic gambling machines with games of chance such as poker, keno, blackjack, and slots.

21.     A criminal record check of TRAN revealed that he has prior felony convictions in California for conspiracy to operate a gambling den and drug premise and two convictions for burglary.

22.     A criminal record check of LE revealed that she has prior felony convictions in California for possession of a controlled substance for sale and a misdemeanor conviction for conspiracy to operate a gambling den.

23.     A criminal record check of NGUYEN revealed that he has prior felony convictions in California for first degree burglary and assault with a firearm on a person.

24.     In December 2018, a CS1[1] met with TRAN during a supervised and recorded law enforcement operation. TRAN described to CS1 how he operates illegal gambling dens where methamphetamine is used and sold. TRAN described how he had trusted employees who operate these locations by acting as doormen, security, the banker, those who audit the machines, and those who collect the money. TRAN described how he is never there, and his employees take the fall when police shut down a location. TRAN described at least

---

[1] CS1 has been a cooperating source of information for over two years. CS1 has criminal convictions for burglary and criminal threats that are more than 10 years old. CS1 was working under contract with the San Diego County District Attorney's Office since November 2019 to work off a pending theft case. Investigators have corroborated information provided by CS1 and have utilized CS1 to obtain search warrants, seize methamphetamine and firearms, and locate fugitives. Investigators believe CS1 to be credible and have not known CS1 to ever be untruthful or provide false information.

three different locations where he was operating a gambling den where drugs were being used and proposed opening a new location with CS1.

25.     Between September 2018 and March 2019, SDPD investigators executed state search warrants at five locations in San Diego. While executing these search warrants, investigators recovered electronic gambling machines, cash, ledgers depicting audits and cash flow, methamphetamine, drug paraphernalia, and electronic devices such as cellular phones. Investigators interviewed patrons and suspects detained at each these search warrant locations. Through these interviews, evidence recovered, follow-up search warrants on cellular devices, and other evidence such as signage and ledgers, investigators identified TRAN as the owner at each location. A male named Tung Nguyen, aka "Ang," was also identified as one of TRAN's employees who conducts audits, provides bankroll money, and collects money from these locations. During the execution of the search warrants, investigators seized gambling machines and the money inside them. The sum of the money seized for each location exceeded $2000. Investigators were able to determine that TRAN's organization involved more than five individuals who conducted, financed, managed, supervised, directed and/or owned all or part of the illegal gambling businesses. Images from inside three of the gambling locations that have been investigated but are now closed are included below:

26.     On February 7, 2019, SDPD officers spoke to Tung Nguyen in the alley behind 3656 ½ 43rd Street. This location was being operated by TRAN, which was a known gambling den where methamphetamine was being used and sold. Nguyen had over $2,800 cash in his possession and was pending authorization from San Diego County Probation to be arrested for a probation violation. Nguyen agreed to be transported to a police station to be interviewed. SDPD investigators read Nguyen his Miranda Rights, which he waived. In the interview that followed, Nguyen admitted to picking up money for TRAN from at least six different gambling dens where methamphetamine was being used and sold. Nguyen described and showed how he had communication with TRAN on Facebook Messenger regarding audits, collecting money, and photographs of ledger pages.

27.     On October 15, 2020, investigators executed federal search warrants issued by the Honorable Bernard G. Skomal and searched the gambling den owned by LE at 4258 ½ Euclid Avenue, San Diego, CA as well as her residence at 4264 Euclid Avenue #2, San Diego, CA.  During the search of the gambling den, eight video gaming machines, five cell phones, gaming logs, keys, a DVR which was connected to the gambling den's security system, narcotic paraphernalia, documentation of illegal gambling and $695.00 in U.S. Currency from the video gaming machines, were found and seized.

28.     An additional federal search warrant was obtained to review the video on the DVR hard-drive seized on October 15, 2020 from 4258 ½ Euclid Avenue, San Diego, CA. The review found there were four camera views, two interior and two exterior, and the extracted video files were from the date range of October 10, 2020 to October 15, 2020. Review on interior camera views noted numerous patrons gambling at the electronic gambling machines, identified individuals as employees, and observed patrons and employees smoking methamphetamine. Exterior video shows employees using a key to lock and unlock gate and shows an employee getting into a vehicle registered to Thanh Lan NGUYEN, one of the owners at a gambling den located at 4776 El Cajon Boulevard #102, San Diego, CA.

29.     Between January 20, 2021 and April 9, 2021, investigators conducted more than twenty-five undercover employee and confidential source operations in identified gambling dens in San Diego, California. Consistently at each gambling den there were patrons playing US currency at electronic gambling machines, observable signs of narcotics use, such as patrons smoking methamphetamine or methamphetamine pipes sitting on gambling machines, surveillance systems monitoring the interior and exterior of the gambling den and employees working in the gambling dens. Employees most often were identified as doorman and cashiers.

*Seizure of Target Devices*

30.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 4776 El Cajon Blvd #102, San Diego, CA

92115. During the search of the gambling den, 16 electronic gambling machines, one (1) cell phone (**Target Device 1),** gambling records, and $1,374.00 in U.S. currency were found and seized. **Target Device 1** was found on Thi Thanh Hoa NGUYEN's person. Thi NGUYEN was identified by a patron as the employee managing/acting as the cashier for the gambling den when the search warrant was executed. Approximately $900 in US currency was found on Thi NGUYENS person in a fanny pack.

31.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 3772 Euclid Avenue, San Diego, CA 92105. During the search of the gambling den, 18 electronic gambling machines, $907 in U.S. Currency, a quantity of narcotics, three Samsung tablets, a DVR Recording system (**Target Device 2),** and other miscellaneous items were found and seized. **Target Device 2** was located inside of the main gambling room.

32.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 3845 45th Street #2, San Diego, CA 92105. During the search of the gambling den, 13 electronic gambling machines, a computer tower, a bag of pills, $226 in U.S. Currency from the video gaming machines, $22,681.00 in U.S. Currency from the gambling den, and a DVR Recording System (**Target Device 3**) were found and seized. **Target Device 3** was located on top of a shelf inside the main gambling room.

33.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 2710 Highland Avenue, San Diego, CA 92105. During the search of the gambling den, 11 electronic gambling machines, documentation of illegal gambling, $3,962 in U.S. currency from the gambling den, $4,226 in U.S. currency from the gaming machines, two cell phones, including **Target Device 4** and **Target Device 5,** four tablets, and two laptops were found and seized. **Target Device 4** was claimed by Tam LAI and found on LAI's bed inside of his bedroom. **Target Device 5** was found inside of a purse in Tam LAI's room and was claimed by Manisaeng Soukhaseum [girlfriend of Tam LAI]. Soukhaseum provided LAI lived at the gambling

den and initially claimed LAI owned the machines, later in the interview Soukhaseum stated she was unsure who owned the gambling machines. Soukhaseumwas ewas not aware of drug dealing at the residence, but noted people who came to the residence used drugs on occasion including herself.

34.     On April 14, 2021, investigators executed a federal search warrant issued by the Honorable Allison H. Goddard and searched 5221 Geneva Avenue, San Diego, CA 92114. During the search of the gambling den, 22 electronic gambling machines, narcotics and narcotic paraphernalia, $3,085 in U.S. Currency from the gambling den, $1,364 in U.S. Currency from the electronic gambling machines, a laptop, a computer, and three cell phones, including **Target Device 6, Target Device 7,** and **Target Device 8**, were found and seized. **Target Device 6** was found in the main gambling room on a desk in the back corner, in what appeared to be an office area. **Target Device 7** was found in the front bedroom, where identifying documents were found for Nhan Thanh NGUYEN. Nhan NGUYEN has been previously identified during CS operations as an employee at multiple gambling dens. **Target Device 8** was seized from Jasmine RIPP's person. RIPP was taken into custody on an outstanding federal warrant for a violation of supervised release. RIPP was identified by a patron as an employee of the gambling den.

35.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 4212 Copeland, San Diego, CA 92105. During the search of the gambling den, 26 electronic gambling machines, five cell phones, including **Target Device 9,** one DVR Recording System (**Target Device 10),** suspected methamphetamine, $26,668.00 in U.S. Currency from the gambling den, $1,937.00 in U.S. Currency from the electronic gambling machines, and other miscellaneous items were found and seized. **Target Device 9** was found on a chair at the front desk "security" area prior to entering the gambling den. When law enforcement officers executed the search warrant, officers encountered Ernesto BUSTILLOS sitting on the chair where the phone was later found. In May 2020, BUSTILLOS was also found in a gambling den during the execution of a state warrant. During interviews on both occasions BUSTILLOS indicated

13

he was not in the locations gambling. **Target Device 10** was located on a desk/office area in the bedroom of the gambling den.

36.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 4727 Federal Boulevard, San Diego, CA 92102. During the search of the gambling den, 16 electronic gambling machines, one cell phone, documentation of illegal gambling, a DVR Recording System (**Target Device 11**), and $317 in U.S. Currency were found and seized. **Target Device 11** was located in a small room off to the side of the main gambling room with a sign that read, "Employees Only."

37.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 4834 University Avenue, San Diego, CA 92105. During the search of the gambling den, 26 electronic gambling machines, a Glock 22 handgun, 18 rounds of ammunition, $3,110 in U.S. Currency from a backpack, $760 in U.S. Currency from the gambling den, suspected methamphetamine and narcotic paraphernalia, firearm parts, a stolen government laptop, three cell phones, including **Target Device 12, Target Device 13,** and **Target Device 14,** a DVR Recording system (**Target Device 15),** and other miscellaneous items, were found and seized. **Target Device 12** was found in a backpack along with the handgun and U.S. currency, which was located at the front security desk cubicle of the gambling den. **Target Device 13** and **Target Device 14** were located at the front security desk cubicle of the gambling den. **Target Device 15** was located inside the main gambling room at the front desk area.

38.     On April 14, 2021, investigators executed federal search warrants issued by the Honorable Mitchell D. Dembin and searched 3690 43rd Street, San Diego, CA 92105. During the search of the gambling den, 11 electronic gambling machines, $1,423 in U.S. Currency from the electronic gambling machines, $1,471 in U.S. Currency from the residence, narcotics and narcotic paraphernalia, a cell phone (**Target Device 16),** and other miscellaneous items, were found and seized. **Target Device 16** was found on a coffee table in the living room of the residence and claimed by Jimmy LU. LU was arrested based on a

federal arrest warrant from a Grand Jury indictment for charges related to operating an illegal gambling den and maintaining a drug involved premise.

BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANTS

39.    Based upon my training and experience, consultation with other law enforcement officers experienced in illegal gambling den investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists that the **Target Devices** were used by gambling den employees and/or associates and will contain electronic evidence of illegal gambling den and narcotics distribution described above.

40.    In addition, I know that individuals engaged in illegal gambling dens and narcotics distribution often use their cell phones and electronic media to conspire, plan and coordinate their criminal activities and that cellphones and electronic media retain evidence of their crimes such as communications, photographs, videos, contact information of co-conspirators, location data, travel arrangements, media about the robberies they committed, research on how to successfully distribute narcotics and run an illegal gambling den, and financial data that evidence their narcotics and gambling activities, and usually maintain their cell phones on their person and/or their residence and vehicles.

41.    I also know individuals engaged in the operation of illegal gambling dens utilize video surveillance cameras as a security measure and to monitor their business activities. These videos are often saved electronically onto hard drives inside DVR devices and in off-site electronic storage mediums commonly known as "clouds". DVR devices commonly contain video files, photograph files of saved screen shots, user information user/log-in information, historical data such as date and time, and other data. These videos and photographs can show individuals and their co-conspirators engaging in illegal gambling activity, money laundering, drug sales and use, and other criminal activity that occurs inside these locations.

//

//

//

15

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

ELECTRONIC DEVICES

42.   It is not possible to determine, merely by knowing an electronic devices' make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Electronic devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many electronic devices like cellular telephones and iPads do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive. However, although manual review and digital photograph may be necessary, it is impractical because of the volume of data that may exist on a cellular phone and the manner in which that data may be displayed. For instance, manual review may require hundreds or even thousands of photographs to capture a conversation with a single other person.

43.   Further, forensic data acquisition may allow for the recovery of data that is not visible to an agent manually reviewing the contents of an electronic device. For

instance, in some instances, forensic data acquisition involves creating an image of the entirety of the phone's/iPad's memory, including "unallocated" areas where deleted information may be stored. If unallocated space is successfully imaged, forensic reviewers may be able to access data that had previously been deleted. In those cases, deleted data recovered through forensic analysis would not be visible to an individual manually reviewing the contents of the phone, and therefore, could not be photographed during a manual review.

44.    A cellular phone/iPad that is subject to forensic data acquisition can generally be returned to its user once data has been extracted without any indication that data has been extracted. Similarly, a phone/iPad that is not subject to forensic data acquisition can generally be manually reviewed returned to its user without any indication that it has been manually reviewed.

45.    Following the issuance of this warrant, I will collect the **Target Devices** and subject the devices to analysis. All forensic analysis of the data contained within the device and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

46.    A review of forensically extracted data or digital photographs taken during the manual review process for items subject to seizure may take weeks or months. The personnel conducting the analysis of that data will complete their analysis within ninety (90) days, absent further application to this court.

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

DVR SYSTEM

47.    With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding DVR/electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

//

//

*Seizure and Retention of Instrumentalities*

a.      Based upon the foregoing, there is probable cause to believe that DVR system encountered during this search may contain contraband and fruits of crime as provided at Rule 41(c)(2) of the Federal Rules of Criminal Procedure, or were used in committing crime as provided at Rule 41(c)(3), and are therefore instrumentalities of the enumerated offenses. Consequently, the DVR is subject to seizure, retention, and possible forfeiture and destruction.  Computers, other electronic storage devices, and electronic media that agents confirm onsite contain contraband, constitute fruits of crime, or have been used to commit crime will not be returned. Instead, those DVR and media will be imaged offsite and analyzed as provided beginning at subparagraph (c) below.  The onsite confirmation may be provided by an owner or user of the computer or storage device or, if feasible, may be obtained by conducting a limited onsite forensic examination to determine if the subject media contains any contraband or otherwise is an instrumentality.  Computers and other electronic storage devices and media that are not confirmed onsite as instrumentalities will be taken offsite for imaging and preliminary analysis in accordance with subparagraph (b) below.

b.      The offsite imaging and preliminary analysis of the DVR system and media to confirm their status as instrumentalities will be conducted within forty-five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below.  If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

c.      DVR system and other electronic storage devices and media that are retained as instrumentalities will not be returned to the owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific

need. The identified official or other representative of the seizing agency will reply in writing. If the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g) of the Federal Rules of Criminal Procedure.

*Identification and Extraction of Relevant Data*

d.     A forensic image is an exact physical copy of the hard drive or other electronic storage media. After obtaining a forensic image, the imaged copy will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e.     Analyzing the contents of a DVR system or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet

applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image.  Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.  To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

f.      It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data.  Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g.    Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent to 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent to 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.  And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

h.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days from the date of seizure pursuant to this warrant, absent further application to this court.

i.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

*Prior Attempts to Obtain Data*

48.    The United States has not attempted to obtain this data by other means.

//

//

21

CONCLUSION

49.     Based upon my training and experience, and the facts so far, there is probable cause to believe evidence of violations of Title 21, United States Code, Section 856, (Maintaining a Drug Involved Premises); Title 18, United States Code, Section 1955, (Illegal Gambling); and Title 18, United States Code, Section 371 (Conspiracy to Maintain a Drug Involved Premises and Illegal Gambling Business) will be found in the **Target Devices** as described in Attachments A-1 through A-16. Therefore, I seek authorization to search them for evidence of these violations, as described in Attachments B-1 through B-16.

_Kari S. Harrison_
Kari S. Harrison
FBI Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 28th day of April, 2021.

_Barbara L Major_
HON. BARBARA L. MAJOR
United States Magistrate Judge

**ATTACHMENT A-10**
DESCRIPTION OF PROPERTY TO BE SEARCHED

The property/item to be searched is described as:

A NightOwl 3.0 DVR with model # DVR-X3-81-JF, and SN # 977C-001392 seized from gambling den at 4212 Copeland, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B211 (**Target Device 10**).

**Target Device 10** is currently in the possession of San Diego FBI and is being held as evidence in the Southern District of California.

## ATTACHMENT B-10
ITEMS TO BE SEIZED

Authorization to search the DVR described in Attachment A-10, includes the search of disks, hard drives, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the DVR. The seizure and search of the DVR will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the DVR will be electronic records and data such as video files, photograph files, log in and user information, and storage files including historical information such as date, time, and location, for the period from **October 15, 2020 to and including April 14, 2021**:

a.   Tending to establish illegal gambling, controlled substance distribution, and controlled substance consumption;

b.   Tending to identify any co-conspirators involved in the activities above;

c.   Tending to demonstrate or corroborate the users of **Target Device 2**;

d.   Tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the maintaining a drug involved premises and illegal gambling;

e.   Tending to identify the presence at locations related to drug involved premises and locations involved in gambling;

f.   Tending to identify the user of, or persons with control over or access to, the **Target Devices**;

g.   Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Section 856, (Maintaining a Drug Involved Premises); Title 18, United States Code, Section 1955, (Illegal Gambling); and Title 18, United States Code, Section 371 (Conspiracy to Maintain a Drug Involved Premises and Illegal Gambling Business).

48